NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0372n.06

No. 22-1522

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 14, 2023
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

SEMAJ LEMAR WILLIAMS,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

Before: COLE, CLAY, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Semaj Williams pled guilty to conspiracy to distribute methamphetamine, reserving his right to appeal the district court's denial of his motion to suppress evidence. The district court thereafter sentenced Williams to the bottom of his Guidelines range. Williams now appeals both the denial of his suppression motion and his sentence. We reject his arguments and affirm.

I.

A.

From 2019 to 2021, Semaj Williams trafficked drugs in western Michigan with two co-conspirators, Tyler Shellenberger and Bryan MacMillan. Shellenberger told police that he first bought methamphetamine from Williams in April 2018 and that, from "mid-February to mid-July 2019," he bought ounce quantities of methamphetamine from Williams "almost daily and sometimes twice per day." Shellenberger also said that he and MacMillan "worked together to

sell the methamphetamine" and that, in March 2019, the pair began buying multiple ounces per day from Williams. MacMillan likewise confessed to buying drugs from Williams and selling them with Shellenberger. According to the Probation Office, the three men were responsible for more than 7,700 grams of methamphetamine.

On March 13, 2021, Kalamazoo Police Officer Colin Morgan saw a silver sedan parked in front of a known drug house. When the car pulled away, it failed to signal; Morgan followed it and ran its license plate through the police database. That search showed that the vehicle lacked insurance, so Morgan pulled the car over.

Morgan approached the driver, Kaniya Ellis, and asked for her documents. A check of the police database showed that she lacked a valid driver's license and had an outstanding arrest warrant. Morgan asked Ellis to step outside the car, where he asked her questions about her warrant, her passengers, where she was coming from, and if she had made any recent stops. Ellis lied twice: first, she denied having made any stops that night; then she said she had stopped, but several blocks from the drug house. When Morgan told Ellis that he had seen her car stopped directly in front of the house moments before, however, she admitted as much. She added that Williams had gone inside the house and quickly returned to the car.

At that point, the traffic stop became a drug investigation, and Morgan asked all three remaining passengers to get out of the car. Morgan said that he removed Williams first and patted him down because Morgan recognized Williams as a "priority offender"—a label the Kalamazoo Police uses for people who commit "the most crimes in the city specifically related to gun and gang violence." Morgan had also seen Williams make "furtive movements towards the center of his body and feet" when Morgan first approached the car. Morgan also said that, "this being a

2

narcotics investigation, people who are dealing narcotics often have weapons on them to defend" themselves and their property.

Williams had no weapons or contraband, but Morgan found marijuana in another passenger's bag, so he called for a police dog to search the rest of the car. As they waited for the K-9 unit, Morgan asked Ellis if the car contained any other contraband. She said she thought there was methamphetamine in the car, that it belonged to Williams, and that Williams was a drug dealer. After the dog arrived, it alerted to the floor of the rear passenger seat, where Williams had just been sitting. There, officers found 0.98 grams of cocaine base and just over 68 grams of pure methamphetamine. Morgan then arrested Williams for drug possession.

### B.

A grand jury thereafter indicted Williams on one count of conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii), and one count of possession of 50 grams or more of methamphetamine with the intent to distribute, 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)—the latter charge being for the drugs found during his arrest.

Williams moved to suppress the evidence seized from Ellis's car. Williams conceded the legality of the initial traffic stop, but argued that Morgan violated the Fourth Amendment by impermissibly prolonging the encounter and by patting Williams down. The district court rejected both arguments, after which Williams pled guilty to the conspiracy count—reserving his right to appeal the denial of his suppression motion. In exchange, the government dismissed the possession charge.

Williams's presentence investigation report found him responsible for a total converted drug weight of 16,816.51 kilograms under the Sentencing Guidelines, based largely on the amount

of drugs that Shellenberger said the conspiracy had sold. *See* U.S.S.G. 2D1.1, App. N. 8(D). This drug quantity, combined with Williams's numerous prior criminal convictions, resulted in a Guidelines range of 188 to 235 months' imprisonment.

At sentencing, Williams argued that he should not be held responsible for the drugs found during his arrest or for most of the drugs involved in the conspiracy. Williams also argued that several factors related to his difficult upbringing and personal characteristics warranted a below-Guidelines sentence. After a lengthy colloquy about these arguments, the court laid out several reasons for its decision and imposed a 188-month prison sentence. This appeal followed.

II.

A.

We begin with the denial of Williams's suppression motion, reviewing the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016).

A traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (cleaned up). Beyond "determining whether to issue a traffic ticket," however, "an officer's mission includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (cleaned up). Nor do "context-framing questions" about a driver's "travel history and plans" impermissibly prolong the stop. *United States v. Williams*, 68 F.4th 304, 307 (6th Cir. 2023) (internal quotation marks omitted). To investigate beyond the initial traffic violation, rather, police need to clear only the low bar of reasonable suspicion. *Id.* at 308.

Here, Williams argues that Morgan prolonged the traffic stop beyond the time necessary to issue Ellis a ticket. But Morgan soon had reasonable suspicion to extend the encounter. Specifically, Morgan promptly learned that Ellis lacked a valid driver's license, that her car lacked insurance, and that both Ellis and another passenger had outstanding arrest warrants. Ellis then repeatedly lied to Morgan about where she had just been driving. These lies, when viewed in the totality of the circumstances, supported a determination that there was at least "a moderate chance of finding evidence of illegality[.]" *Id.* at 308 (cleaned up). And Ellis then admitted that, minutes before, the car had stopped at a known drug house, that Williams had gone inside and returned to the car, and that she thought Williams was a drug dealer transporting methamphetamine. This information created the reasonable suspicion necessary for Morgan to begin a narcotics investigation and to call for a police dog to confirm Ellis's report. *See, e.g.*, *id*. And the "positive indication from a narcotics-detection dog" in turn supplied Morgan with probable cause to conduct a warrantless search of Ellis's car. *United States v. Figueredo-Diaz*, 718 F.3d 568, 575 (6th Cir. 2013). Thus—from the initial traffic stop to the discovery of drugs at Williams's feet—reasonable suspicion supported each of Morgan's decisions to extend his investigation.

Williams also argues that Morgan lacked reasonable suspicion to pat him down. But that search produced no evidence, which means that it is immaterial to Williams's motion to suppress. This argument is therefore meritless.

B.

We turn next to Williams's challenges to his sentence, which we generally review for an abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 41 (2007).

1.

a.

Williams argues that the drugs found during his arrest were not part of the conspiracy and that the court thus procedurally erred when it considered possession of those drugs "relevant conduct" at sentencing. *See* U.S.S.G. § 1B1.3(a)(1)(A). But Williams admitted in his plea agreement both to "selling drugs directly to customers himself" as part of the conspiracy and that, "on or about March 13, 2021," he "agreed to sell a quarter pound (four ounces) of methamphetamine to a customer in exchange for $1,800." Moreover, his plea agreement stated that "the Court may consider the dismissed" drug-possession count "in determining the applicable Sentencing Guidelines range" for his conspiracy conviction. The district court therefore did not abuse its discretion when it considered Williams's drug possession as relevant conduct when determining his sentence.

Williams next argues that the court procedurally erred when it attributed to him the full amount of drugs that Shellenberger had said was part of the conspiracy. "A district court's drug-quantity determination is a factual finding that" this court reviews "under the clearly erroneous standard. If the exact amount of drugs is undetermined, an estimate will suffice" if that estimate is supported by a "preponderance of the evidence." *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (cleaned up). Testimonial evidence "from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004) (cleaned up). Moreover, at sentencing, coconspirators are responsible for "all acts and omissions of others that were reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B)(iii).

Here, based on Shellenberger's statements, the district court adopted the Probation Office's "conservative estimate" that Williams was responsible for a converted drug weight of 16,816.51 kilograms. Williams contends that the district court instead should have considered only MacMillan's statements, in which he identified a smaller quantity of drugs. But Williams pled guilty to supplying both Shellenberger and MacMillan with drugs; and Shellenberger said that MacMillan "was with him most of the time" when Shellenberger bought methamphetamine from Williams—not every time. *Id.* at 218. The district court therefore did not clearly err when it credited Shellenberger's proffer in its calculation of Williams's relevant conduct under the Guidelines. *See Jeross*, 521 F.3d at 570.

b.

Williams next argues that the district court "did not adequately address" several arguments Williams had raised in support of a lower sentence, including his "incomplete brain maturation, traumas he has endured, and severe addictions he has suffered[.]" During sentencing, however, the district court specifically asked Williams whether he was "satisfied I've addressed all of your arguments on the record"; and Williams's counsel answered "yes." At most, therefore, we review this argument for plain error. *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).

There was none here. At Williams's sentencing hearing, the district court engaged in a lengthy colloquy in which it outlined the § 3553(a) factors, acknowledged the advisory nature of the Guidelines, and said that it had taken them "into account as an initial benchmark or starting point" in this case. The court also discussed, among other things, the destructive effects of methamphetamine in western Michigan, and that—given Williams's many prior convictions— Williams needed "to be specifically deterred by the sentence" in this case. The court then imposed

a sentence at the bottom of Williams's Guidelines range. The court also included specific recommendations that Williams receive substance-abuse and cognitive counseling and that he be housed close to his family. Thus, "the record makes clear that the sentencing judge listened to each argument, considered the supporting evidence, was fully aware of the defendant's circumstances and took them into account in sentencing him." *Vonner*, 516 F.3d at 387. We see no plain error regarding the procedure of Williams's sentencing.

2.

Finally, Williams argues that his sentence was substantively unreasonable. We presume the contrary, given that his sentence was within (indeed at the bottom of) his Guidelines range. *See, e.g.*, *United States v. Lapsins*, 570 F.3d 758, 774 (6th Cir. 2009). Williams has not rebutted that presumption: his arguments amount to no more than a disagreement with the sentence chosen by the district court. *See United States v. Adkins*, 729 F.3d 559, 572 (6th Cir. 2013).

The district court's judgment is affirmed.